**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHIMON MAODI *et al.*,<br>*Plaintiffs*,<br>v.<br>ISLAMIC REPUBLIC OF IRAN,<br>*Defendant*. | Case No. 24-cv-1146 (ACR) (GMH) |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This action is brought by six plaintiffs arising out of a series of coordinated terrorist attacks that occurred across southern Israel on October 7, 2023, in which Noi Maodi was killed ("the Attacks"). His estate and members of his family ("Family Member Plaintiffs") bring this action against the Islamic Republic of Iran under the state sponsor of terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, seeking compensation for their physical and emotional injuries. They allege that the Attacks were orchestrated by Hamas with material support from Iran. When Iran failed to appear to defend this action, Plaintiffs filed a motion for default judgement. For the following reasons, the undersigned recommends granting Plaintiffs' motion and awarding damages as detailed below. [1]

[1] The relevant docket entries considered by the undersigned are (1) Plaintiffs' Complaint, ECF No. 1; (2) Affidavit Requesting Foreign Mailing, ECF No. 8; (3) Certificate of Clerk Mailing Copy of Summons and Complaint to Iran, ECF No. 11; (4) Notice of Failed Service under 28 U.S.C. §1608(a)(3), ECF No. 12; (5) Affidavit Requesting Foreign Mailing, ECF No. 13; (6) Certificate of Clerk dispatching copy of summons and complaint to Iran, ECF No. 15; (7) Summons Returned Unexecuted, ECF No. 16; (8) Affidavit for Default, ECF No. 18; (9) Clerk's Entry of Default, ECF No. 19; and (10) Motion for Default Judgment, ECF No. 21. Citations to page numbers herein reflect the pagination assigned by the Electronic Case Filing system.

# I. BACKGROUND

## A. The Killing of Noi Maodi

At the time of his death, Noi[2] was a 29-year-old dual Israeli and American citizen living in Israel. ECF No. 1, ¶ 13; No. 21-2 at 9; No. 21-11 at 1. In 2022, he moved back to Israel from the United States. ECF No. 21-8, ¶ 8. After returning to Israel, he worked on his father's flower farm and planned to return to school to study for a master's degree in child psychology. ECF No. 21-5, ¶¶ 8, 10–11.

On October 6, 2023, Noi gathered with his extended family in Moshav Yated in Israel to celebrate Simchat Torah. ECF No. 21-4, ¶ 4. The next morning, Noi attended the nearby Psyduck music festival. *Id.*, ¶ 5. He was joined by his two brothers-in-law, Tomer Kitayevich and Moti, as well as his nephew, Matan.[3] *Id.*, ¶ 5. At around 6:30 A.M. on October 7, 2023, they observed heavy barrages of missile fire launched into Israel while on their way to the festival. *Id.*, ¶ 7. Fearing for their safety, they turned around to drive home in Tomer's car. *Id.*

During the drive back, they were ambushed by "terrorists" at an intersection near Noi's parent's home. *Id.*, ¶ 9; ECF No. 21-2 at 18. According to Tomer, the sole survivor of the attack, upon seeing the car, the attackers "directed a barrage of gunfire towards [it]." ECF No. 21-4, ¶ 9. Noi sustained a bullet wound to his head and shouted that he was bleeding. *Id.* After a few seconds, Noi became quiet and their car rolled to stop. *Id.* The attackers again opened fire. *Id.*, ¶ 10. Noi, Moti, and Matan were killed in the attack. *Id.*, ¶ 10. Noi's body was identified several days later through DNA evidence. *Id.*, ¶ 17.

---

[2] Because this case involves family members with the same last name, the undersigned introduces Plaintiffs by first and last name and subsequently refers to them by first name.

[3] Because Plaintiffs did not provide last names for Matan and Moti, the undersigned will refer to them by only their first names.

### B. Iran's Role in the October 7 Attacks

In his sworn declaration, Tomer does not identify his attackers. *Id.*, ¶ 9. But Plaintiffs allege that the attack was executed by Hamas utilizing "Iran's funding, training, and weapons." ECF No. 21-2 at 9. To support these allegations, Plaintiffs rely on the expert report of Dr. Colin Clarke. *Id.* Under Federal Rule of Evidence 702, an expert must be qualified by "knowledge, skill, experience, training, or education" and their testimony must be "based on sufficient facts or data" and "reliable principles and methods." Fed. R. Evid. 702. Reviewing the record herein, the undersigned finds Dr. Clarke qualifies as an expert on Middle East Terrorism pursuant to rule 702 of the Federal Rules of Evidence.[4]

Dr. Clarke's April 29, 2025's expert report explains that Noi was killed as part of a series of attacks carried about by Hamas from Gaza into Israel on October 7, 2023, which killed approximately 1,200 people. ECF No. 21-3 at 26. There is evidence that Hamas began planning the Attacks as far back as 2021. *Id.* These plans were eventually condensed into a 40-page "battle plan" that was intercepted by Israeli intelligence operatives. *Id.* at 26–27. Indeed, on the day of the attack, Dr. Clarke explains, the battle plan was followed "almost to the letter." *Id.* at 27. First, Hamas launched a barrage of rockets into Israel "as the opening salvo." *Id.* The rockets were followed by drone attacks to disable the security systems on the Israeli-Gaza border. *Id.* After the security systems were disabled, Hamas conducted "a blitzkrieg-style assault using paragliders and

[4] Dr. Clarke has spent his career "studying terrorist groups and state sponsors of terrorism." ECF No. 21-3 at 3. He earned his Ph.D. from the University of Pittsburgh's Graduate School of Public and International Affairs. *Id.* He then worked at the RAND Corporation for ten years. *Id.* While at the RAND corporation, Dr. Clarke worked on terrorism-related projects for the Office of the Secretary of Defense, the U.S. intelligence community, and U.S. military's combatant commands. *Id.* at 3–4. Dr. Clarke also previously taught courses on terrorism at Carnegie Mellon University's Institute for Politics and Strategy and Served as Director of Policy and Research at the Soufan Group. *Id.* at 4. Currently, Dr. Clarke works as an Associate Fellow at the International Centre for Counter-Terrorism at the Hague. *Id.* Dr. Clarke has testified before Congress as an expert witness on terrorism-related issues multiple times and has published several books on the subject. *Id.* at 4–5. He was also previously qualified as an expert in "Middle Eastern Terrorism" in *Cabrera*, *et al.*, *v. Islamic Republic of Iran*. *Id.* at 6; *Cabrera, et al., v. Islamic Republic of Iran*, Nos. 18-cv-2065, 19-cv-2065, 2022 WL 2817730, at *4 (D.D.C. July 19, 2022).

motorcycles." *Id.* The Attacks occurred in and around Southern Israel, where the Psyduck music festival was located. *Id*. at 3, 26.

As discussed in greater depth below, Dr. Clarke opines that there is substantial evidence that Iran's support was "[e]ssential" to the Attacks. *Id.* at 28. For instance, in the lead up to the Attacks, there were multiple high-level meetings between Iran Revolutionary Guard Corps-Quds Force (IRGC-QF) and Hamas fighters "to provide instruction and strategize." *Id.* Additionally, the Israeli Defense Force (IDF) recovered Iranian sniper rifles as well as Iranian-made mortar rounds, fuses, and demolition charges used in the Attacks. *Id.* at 32. Dr. Clarke opines that such instances of support are part of Iran's broader usage of terrorist groups as proxies "effectively to challenge Israel, the United States, and a range of other powers all vying for influence in the Middle East." *Id.* at 7. Based on the evidence he reviewed, Dr. Clarke concludes that Iran "directly enabled Hamas's execution of [the Attacks]." *Id.* at 34.

**C. Procedural Background**

Plaintiffs filed their complaint on April 19, 2024, seeking to hold Iran responsible under the terrorism exception of the FSIA for Noi's death. ECF No. 1. On June 20, 2024, they filed a request to proceed with service pursuant to 28 U.S.C. § 1608(a)(3), a provision of the FSIA that allows for service to be attempted on a foreign state via any form of mail requiring a signed receipt. ECF No. 8. Pursuant to 28 U.S.C. § 1608(a)(3), the Clerk of Court dispatched one copy of the summons, complaint, and notice of suit, together with a translation in Persian to the Acting Foreign Minister of Iran on July 2, 2024, via the U.S. Postal Service. ECF No. 11. The materials were not delivered. ECF No. 13-1 at 1.

After waiting the requisite 30 days, Plaintiffs requested service under 28 U.S.C. § 1608(a)(4). ECF No. 13-1 at 1–2. Section 1608(a)(4) allows for service to be attempted on a foreign state by sending the summons, complaint, and notice of suit through diplomatic channels

if service cannot be made within 30 days under 28 U.S.C. § 1608(a)(3). 28 U.S.C. § 1608(a)(4). On August 14, 2024, the Clerk mailed two copies of the summons, complaint, and notice of suit, together with a translation of each into Persian to the U.S. Department of State. ECF No. 15. Service was executed on Iran via diplomatic note on November 11, 2024. ECF No. 16. Thereafter, Defendants had until January 10, 2025, to file an answer. Fed. R. Civ. P. 12(a)(1).

When Defendants failed to respond by the deadline, Plaintiffs filed an affidavit in support of default against Iran on January 24, 2025. ECF No. 18. The Clerk of the Court entered default on January 29, 2025. ECF No. 19. On November 12, 2025, in anticipation of Plaintiffs' motion for default judgment, the case was referred to the undersigned for a Report and Recommendation. Minute Order (Nov. 12, 2025). On January 30, 2026, Plaintiffs filed a motion for default judgment as to liability and for an award of compensatory, economic, and punitive damages. ECF No. 21.

## II. LEGAL STANDARD

The Federal Rules of Civil Procedure establish a two-step process for entry of default judgment. Fed. R. Civ. P. 55(a)–(b); *see also United States v. Twenty-Four Cryptocurrency Accounts*, 473 F. Supp. 3d 1, 4 (D.D.C. 2020). First, a plaintiff must request "that the Clerk of Court enter default against a party who has failed to plead or otherwise defend." *Cryptocurrency*, 473 F. Supp. 3d at 4 (citing Fed. R. Civ. P. 55(a)). Second, the plaintiff must then apply for a default judgment against the absent defendant. *Id.* (citing Fed. R. Ci *v.* P. 55(b)).

A default judgment is available only when "the adversary process has been halted because of an essentially unresponsive party." *Doe v. Syrian Arab Republic*, No. 18-cv-66, 2020 WL 5422844, at *5 (D.D.C. Sep. 10, 2020) (internal citations omitted). "[D]efault judgment is warranted if a defendant is a 'totally unresponsive' party and its default is plainly willful, as reflected by its failure to respond, 'either to the summons and complaint, the entry of default, or the motion for default judgment.'" *Id.* (internal citations omitted). However, a notation of default by the

Clerk of the Court against an unresponsive defendant does not automatically entitle a plaintiff to a default judgment. Rather, it is appropriate only if the complaint's well-pleaded allegations, accepted as true, state an adequate claim for relief. *See Marmaras v. Marafatsos*, No. 18-1236, 2019 WL 3414363, at *2 (D.D.C. July 29, 2019); *Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 26–27 (D.D.C. 2008). In other words, entry of default "'establishes the defaulting party's liability for the well-pleaded allegations of the complaint,' but not for allegations that are not sufficiently pleaded." *United States v. $6,999,925.00 of Funds Associated with Velmur Mgmt. Pte Ltd.*, 368 F. Supp. 3d 10, 17 (D.D.C. 2019) (quoting *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011)). In that way, "'[c]onceptually, . . . a motion for default judgment is like a reverse motion to dismiss for failure to state a claim.'" *Doe*, 2020 WL 5422844, at *5 (alteration in original) (quoting *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015)).

Before a default judgment can be entered against a foreign sovereign, the FSIA requires a plaintiff to establish his or her "claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). That evidence must also be admissible. *Owens v. Islamic Republic of Sudan*, 864 F. Supp. 3d 751, 786–87 (D.C. 2017), *vacated and remanded sub nom on other grounds.*, *Opati v. Republic of Sudan*, 590 U.S. 418 (2020). A court must "scrutinize the plaintiff's allegations and 'may not unquestioningly accept a complaint's unsupported allegations as true.'" *Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 152 (D.D.C. 2019) (quoting *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012)). However, "[c]ourts take uncontroverted factual allegations that are supported by admissible evidence as true." *Blank v. Islamic Republic of Iran*, No. 19-cv-3645, 2021 WL 3021450, at *6 (D.D.C. July 17, 2021) (internal citations omitted). An evidentiary hearing is not required; rather, a "plaintiff may establish proof by affidavit." *Compagnie Sahélienne d'Entreprise v. Republic of Guinea*, No. 20-cv-1536, 2021 WL 2417105, at *2

(D.D.C. June 14, 2021); *see also Przewozman v. Islamic Republic of Iran*, 628 F. Supp. 3d 307, 312 (D.D.C. 2022) ("'In the absence of an evidentiary hearing,' plaintiffs may satisfy their burden of demonstrating personal jurisdiction by making a 'prima facie showing' based on 'their pleadings,' and 'bolstered by such affidavits and other written materials as they can otherwise obtain.'" (quoting *Mwani v. Bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005))).

Additionally, "the procedural posture of a default does not relieve a federal court of its 'affirmative obligation' to determine whether it has subject-matter jurisdiction over the action." *Egypt Dep't of Def. v. Alboghdady*, No. 21-cv-1144, 2021 WL 3737682, at *3 (D.D.C. Aug. 24, 2021) (quoting *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996)). The party seeking the default judgment is required to demonstrate that "the court has both subject-matter jurisdiction over the action and personal jurisdiction over the absent defendant." *Radmanesh v. Gov't of Islamic Republic of Iran*, No. 17-cv-1708, 2019 WL 1787615, at *2 (D.D.C. Apr. 24, 2019), *aff'd sub nom. Radmanesh v. Islamic Republic of Iran*, 6 F.4th 1338 (D.C. Cir. 2021). And "'[e]ven if there are sufficient contacts for a court to assert personal jurisdiction over a defendant, it lacks power to do so unless the procedural requirements of effective service of process are satisfied.'" *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 514 (D.C. Cir. 2002), *overruled on other grounds by Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021).

If a court deems default judgment appropriate, it must independently determine the appropriate remedies. *See Pescatore v. Palmera Pineda*, 345 F. Supp. 3d 68, 70 (D.D.C. 2018) ("'[U]nless the amount of damages is certain, the court is required to make an independent determination of the sum to be awarded.'" (quoting *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001))). Specifically, "unlike a plaintiff's well-pleaded allegations as to liability, a court does not take factual allegations related to damages as true." *Doe*, 2020 WL 5422844, at *6. Rather, "a

court makes its damages determination 'in light of the facts and the circumstances of the case at hand.'" *Id.* (quoting *SEC v. Whittemore*, 691 F. Supp. 2d 198, 209 (D.D.C. 2010)). "While the court may conduct a hearing to fix the amount of damages, it is not required to do so, 'as long as it ensure[s] that there [is] a basis for the damages specified in the default judgement.'" *Id.* (quoting *SEC v. China Holdings, Inc.*, No. 09-cv-2045, 2010 WL 11603046, at *2 (D.D.C. Sep. 24, 2010) (alterations in original)).

## III. DISCUSSION

Plaintiffs move for the entry of a default judgment against Iran and an award of damages. To receive them, they must establish the Court's subject matter jurisdiction and personal jurisdiction over Iran, Iran's liability for Noi's death, and their entitlement to damages. Taking those issues in turn, the undersigned concludes that Plaintiffs have established subject matter and personal jurisdiction, Iran's liability for Noi's death, and their entitlement to damages. Accordingly, the undersigned recommends granting Plaintiffs' motion, entering a default judgment, and awarding damages in the amounts outlined below.

### A. Subject Matter Jurisdiction

Under the FSIA, the Court has personal jurisdiction over any defendant if (1) the Court has subject matter jurisdiction under the FSIA and (2) the defendant was properly served. *See* 28 U.S.C. § 1330(b). Therefore, the undersigned begins with the issue of subject matter jurisdiction over Plaintiff's claims before turning to service of process.

Section 1330(a) of Title 28 of the United States Code grants district courts original jurisdiction "without regard to amount in controversy" over (1) nonjury civil actions (2) as to any claim for relief *in personam* (3) against a foreign state (4) provided that the foreign state is not entitled to immunity under sections 1605 to 1607 of the FSIA or under international agreement. *See* 28 U.S.C. § 1330(a); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017); *Reed*,

845 F. Supp. 2d at 210. The first three factors are easily met here: (1) Plaintiffs filed a nonjury civil action, (2) seeking *in personam* relief, (3) against a foreign state, Iran. *See generally* ECF No. 1. Thus, the Court has subject matter jurisdiction over the present "nonjury civil action" against Iran "if, and only if, the conditions for the waiver of immunity found in 28 U.S.C. § 1605A are satisfied." *Fritz v. Islamic Republic of Iran* ("*Fritz I*"), 320 F. Supp. 3d 48, 77 (D.D.C. 2018).

Plaintiffs contend that this lawsuit falls within the FSIA's "terrorism exception" because Defendants provided material support and resources to Hamas causing Plaintiffs' personal injuries because of an extrajudicial killing. *See* 28 U.S.C. § 1605A(a)(1); ECF No. 21-2 at 9. The terrorism exception provides that:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act . . .

28 U.S.C. § 1605A(a)(1). For an FSIA claim to be heard in federal court, the victims seeking relief under this exception must prove that (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred," § 1605A(a)(2)(A)(i)(I); and (2) "the claimant or the victim was, at the time the act . . . occurred a national of the United States," 28 U.S.C. § 1605A(a)(2)(A)(ii)(I).[5] For a foreign sovereign's immunity to be nullified, the plaintiffs must also (3) seek monetary damages "for personal injury or death caused by 'torture, extrajudicial killing, aircraft sabotage, [or] hostage taking"; and (4) the act, or the provision of material support or resources for the act, must be engaged in by an official, employee, or agent of the defendant.

[5] Section 1605A(a)(2)(A)(iii) also requires that, in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant must afford the foreign state a "reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration." Because the Attacks at issue here occurred in Israel, the Plaintiffs do not need to satisfy the arbitration requirements. ECF No. 21-2 at 9; *see also Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 35 (D.D.C. 2016) (holding that the plaintiffs did not need to satisfy the third arbitration requirement because they brought suit against Syria for a terrorist attack that occurred in Jordan).

*Mohammad v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015) (quoting 28 U.S.C. § 1605A(a)(1)). Each requirement will be addressed in turn.

*1. State Sponsor of Terrorism*

The United States designated Iran a state sponsor of terror in January 1984, and it has remained so designated since that time. *See* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz); *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 59 (D.D.C. 2021) (noting that "the U.S. State Department designated Iran as a State Sponsor of Terrorism in 1984"); U.S. Dep't of State, Bureau of Counterterrorism, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism [https://perma.cc/VF4X-JQU4] (last visited on September 14, 2026).

*2. Plaintiff's Citizenship*

Plaintiffs have submitted evidence establishing that Noi became a U.S. citizen prior to his death. Noi's father Shimon Maodi attests in his declaration that Noi was a dual citizen of both Israel and the U.S. ECF No. 21-5, ¶ 4. The declaration of Noi's sister Shani Rosenberg also discusses Noi's reaction to becoming an American citizen. ECF No. 21-9, ¶ 8. Plaintiffs do not provide direct evidence of Noi's citizenship. But such evidence is not required at this stage. *See Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 326-327 (D.D.C. 2014) (accepting that the plaintiffs were U.S. citizens at the default stage when they presented "[u]controverted affidavit evidence"); *see also Braun*, 228 F. Supp. 3d at 76 (same).

To be sure, the Family Member Plaintiffs are all Israeli citizens. ECF No. 21-5, ¶ 2; ECF No. 21-7, ¶ 2; ECF No. 21-8, ¶ 2; ECF No. 21-9, ¶ 2; ECF No. 21-10, ¶ 2. But "'this fact is non-consequential' for jurisdictional purposes. . . because 'the waiver of foreign sovereign immunity applies so long as 'the claimant *or* the victim was, at the time of the' terrorist attack, a U.S. national,

member of the armed forces, or government employee.'" *Estate of Fouty v. Syrian Arab Republic*, 743 F. Supp. 3d 118, 145 (D.D.C. 2024) (quoting *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 369 (D.D.C. 2020) (emphasis added)). Because the direct victim—Noi—was a U.S. citizen, all Plaintiffs have satisfied FSIA's citizenship requirement.

*3. Extrajudicial Killing*

An "[e]xtrajudicial killing" is defined for purposes of the FSIA (by means of the Torture Victim Protection Act of 1991 ("TVPA")) as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any killing that, under international law, is lawfully carried out under the authority of a foreign nation." TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1991) (codified at 28 U.S.C. § 1350 note); 28 U.S.C. § 1350(3)(a); *see also* 28 U.S.C. § 1605A(h)(7). Plaintiffs therefore must show: "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a constituted court." *Owens*, 864 F.3d at 770.

The Attacks that killed Noi meet those requirements. To begin, it is indisputable that Noi's death, as a result of the Attacks, constitutes a killing—he was shot in the head while driving home from a music festival. The Attacks also clearly involved some level of deliberation. *Owens*, 864 F.3d at 770. A deliberated killing is "simply one undertaken with careful consideration, not on a sudden impulse." *Force,* 464 F. Supp. 3d at 363 (quoting *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 264 (D.D.C. 2016)). As discussed above, the Attacks involved intensive planning, investment, and coordination by Hamas and others, dating back to at least 2021. ECF No. 21-3 at 26–27. Finally, there is no evidence in the record that the Attacks were authorized by "a prior judgement affording judicial guarantees or due process." *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 202 (D.D.C. 2017); *see also Han Kim v. Democratic People's Republic of Korea*,

774 F.3d 1044, 1050–51 (concluding that the third prong of *Owens* is satisfied when a killing is done without a showing of due process). Nor were they "lawfully carried out under the authority of a foreign nation," TVPA § 3(a)—Hamas is not a country, it is a terrorist group. *See* ECF No. 21-3 at 11. Accordingly, the undersigned recommends finding that Noi's death was the result of an extrajudicial killing.

*4. Material Support*

Material support is the provision of "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(1); *see* 28 U.S.C. § 1605A(h)(3) (defining "material support or resources" for the purposes of the FSIA to have the "meaning given that term in section 2339A of title 18.").

Although evidence found sufficient to demonstrate a foreign sovereign's material support of a terrorist organization varies, successful showings have generally focused on the foreign state's offer of safe haven to the terrorist group, provision of financing, weapons, or assistance with its recruitment, or motive to foment unrest in an area where the group is operating. *See generally W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 136 (D.D.C. 2019) (finding that Iran provided material support to the Badr Organization through support of efforts to overthrow Sunni rule in Iraq and direct funding); *Thuneibat*, 167 F. Supp. 3d at 36 (finding Syria provided material support to AQI by allowing it to operate and plan terrorist attacks from within Syria by providing essential financing to the group); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 68–69 (D.D.C. 2008) (finding Syria provided material support to AQI by offering it a safe haven for its operations, and by supporting its training and recruitment efforts); *Ben-Rafael v. Islamic Republic of Iran*, 540

F. Supp. 2d 39, 45 (D.D.C. 2008) (finding that Iran provided material support to Hezbollah by funding training camps).

As a threshold matter, the undersigned finds that Plaintiffs have presented sufficient evidence that Hamas was responsible for the Attacks at this stage. In his sworn declaration, the sole survivor of the incident, Tomer, stated that his attackers were "terrorists." ECF No. 21-4, ¶¶ 9–10. In his expert report, Dr. Clarke outlined how these terrorists were likely affiliated with Hamas. He pointed to statements made by Hamas leaders, the Iranian government, and Israeli officials attributing responsibility of the Attacks, at least in part, to Hamas. ECF No. 21-3 at 18, 27, 31. There is also extensive evidence of Hamas's involvement in the planning and execution of the Attacks. In 2021, Hamas's leadership reached out to an IRGC-QF commander requesting $500 million over two years to plan a "spectacular attack." *Id.* at 26. And, in 2022, the IDF intercepted a 40-page document from Hamas outlining plans for an attack on Israel. *Id.* at 26–27. The plans in this document closely mirrored the execution of the Attacks. *Id.* at 27.

Although Plaintiffs do not point to statements of Hamas claiming credit for the Attacks, circumstantial evidence of a terrorist group's responsibility has been deemed sufficient in other FSIA cases. *See, e.g.*, *Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 96–97 (D.D.C. 2019) (accepting the plaintiffs' claim that Houthis were responsible for a kidnapping based on uncontroverted testimony that it was carried out by soldiers known to be allied with the group); *Frost v. Islamic of Iran*, 383 F. Supp. 3d 33, 40–41 (D.D.C. 2019) (crediting testimony that kidnappers were affiliated with Saraya al-Salam when the building where victims were detained displayed relevant flags); *W.A.*, 427 F. Supp. 3d at 117, 135 (concluding that the Badr Organization was responsible for an unclaimed killing based on witness testimony that the attack was consistent with Badr's historic behavior, as well as other circumstantial evidence pointing to the organization).

Accordingly, the undersigned finds that Hamas carried out the attack that killed Noi. *See* ECF No. 21-3 at 26 (stating that Noi was one of the victims of the Attacks).

Plaintiffs have also provided satisfactory proof that Iran provided material support to Hamas. The undersigned is unaware of a case in this Circuit addressing that question with respect to the Attacks at issue. But multiple Courts in this Circuit have concluded that Iran provided material support to Hamas in attacks pre-dated October 7, 2023. *See Braun*, 228 F. Supp. 3d at 76–77; *Przewozman*, 754 F. Supp. 3d. at 21; *Henkin v. Islamic Republic of Iran*, Nos. 18-cv-1273, 19-cv-1184, 2021 WL 2914036, at *2 (D.D.C. July 12, 2021). In those cases, and others, plaintiffs have relied on expert testimony and government reports, as Plaintiffs have here, to demonstrate the foreign state's material support of the terrorist organization at issue. *See Force*, 464 F. Supp. 3d at 337; *W.A.*, 427 F. Supp. 3d at 125 (D.D.C. 2019); *Thuneibat*, 167 F. Supp. 3d at 28; *Gates*, 580 F. Supp. 2d at 56; *Ben-Rafael*, 540 F. Supp. 2d at 47.

Here, Plaintiffs use Dr. Clarke's expert report to link Hamas and Iran. Dr. Clarke states that Iran has financially supported Hamas both directly and indirectly since the group's founding in the 1980s. ECF No. 21-3 at 25. For instance, in 2020, the U.S. State Department estimated that Iran provided $100 million annually in combined support for Hamas. *Id.* And in 2022, a year before the Attacks, the then-leader of Hamas claimed that Iran provided them $70 million a year. *Id*. Dr. Clarke further attests that the Iranian government also provided Hamas significant organizational and operational support, including helping disseminate propaganda, supporting Hamas's recruitment efforts, and providing training and weapons to its members. *Id.* at 13–24. He bases this conclusion on specific examples, including an IDF report that the IRGC-QF provided training to approximately 500 Hamas fighters at a training program held in 2023. *Id.* at 29. He also notes that then-Hamas leader Yahya al-Sinwar in 2019 claimed that Iran was vital to helping Hamas

restore its rocket stockpiles after they were depleted in the group's 2012 and 2014 operations. *Id.* at 23. Again, similar evidence has been found sufficient in FSIA cases to demonstrate Iran's material support of Hamas. *See Braun*, 228 F. Supp. 3d. at 76–77; *Henkin*, 2021 WL 2914036, at *2; *Przewozman*, 754 F. Supp. 3d. at 21.

Dr. Clarke further explains how Iran supported Hamas in the lead up to the Attacks. As mentioned previously, Hamas requested funding from Iran for the planning of the Attacks in 2021. ECF No. 21-3 at 26. This coordination continued, with IRGC officials repeatedly meeting with Hamas leaders in Beirut to help refine the attack plans. *Id.* at 31. Dr. Clarke also highlights evidence that Iran provided Hamas with weapons and technical expertise. *Id.* at 32. The IDF recovered weapons used by Hamas for the Attacks that included "Iranian sniper rifles, Chinese and Russian small arms and light weapons, including AK-47 assault rifles, and rocket- propelled grenades made in North Korea and Bulgaria." *Id.* The IDF also found Iranian-made mortar rounds, fuses, and demolition charges after the Attacks. *Id.* Describing the weapons' link to Iran, Retired General Frank McKenzie, former commander of U.S. Central Command, opined that "[Hamas] got them from somewhere. And the technology assistance to put it together certainly came from Iran." *Id.*

Finally, Plaintiffs have shown that Iran's material support of Hamas was a legally sufficient cause of the Attacks. *See Owens*, 864 F.3d at 778 (requiring plaintiffs to show that the foreign sovereign's material support is a legally sufficient cause of the terrorist attack at issue). To satisfy this standard, Plaintiffs must show that (1) the defendant's actions were a "substantial factor" in the sequence of events that caused plaintiff's injury and (2) the injury was a "reasonably foreseeable consequence or anticipated as a natural consequence" of defendant's conduct. *Id.* at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)). In *Przewozman*, for example, the Court

held that Iran's support was a "substantial factor" in an attack, even without evidence tying that support to the attack at issue, because Iran's aid was essential to the terrorist group's total operating capacity. *Przewozman*, 754 F. Supp. 3d. at 22; *see also Doe*, 2020 WL 5422844, at *11. Plaintiffs in this case have introduced evidence that Iran's support was not just vital to Hamas's total operating capacity, but also to executing the Attacks at issue.

Similarly, Plaintiffs have also shown that their injuries were a reasonably foreseeable consequence of Iran's actions supporting Hamas. In previous cases, sufficient evidence of foreseeability has included actively encouraging the group to carry out attacks on civilians in Israel. *See Przewozman*, 754 F. Supp. 3d at 22. Here, Iran not only encouraged, but also actively supported Hamas in executing the Attacks. *See* ECF No. 21-3 at 28.

For these reasons, the undersigned finds that this Court has subject-matter jurisdiction over this action.

### B. Personal Jurisdiction

The undersigned next examines if effective service has been made pursuant to 28 U.S.C. § 1330(b), which governs personal jurisdiction over foreign sovereigns. That section provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title." 28 U.S.C. § 1330(b). Service is made on a foreign state under section 1608 in one of four ways:

> 1. by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision;
>
> 2. if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents;
>
> 3. if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a

signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

4. if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a). The methods of service provided in section 1608(a) are listed in order of preference; plaintiffs must attempt the first method before proceeding to the next. *Angellino v. Royal Family Al-Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012). "[S]trict adherence to the terms of 1608(a) is required" and "neither substantial compliance, nor actual notice, suffice[s]." *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994)). As many litigants do in FSIA cases against Iran, Plaintiff served Iran via diplomatic channels pursuant to Section 1608(a)(4).

Iran does not have a special arrangement for service with the Plaintiffs, nor has it "entered into any international convention governing service" of judicial documents, so sections 1608(a)(1) and 1608(a)(2) do not provide avenues for service. *Blank*, 2021 WL 3021450, at *8. On June 27, 2024, Plaintiffs attempted service under section 1608(a)(3) and requested the Clerk of the Court mail a copy of the summons and complaint to the Ministry of Foreign Affairs of Iran. *See* ECF No. 8-1 at 1. On July 2, 2024, the Clerk of the Court mailed "one copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of [Iran], by registered mail . . . to the head of the ministry of foreign affairs, pursuant to 28 U.S.C. 1608(a)(3)." ECF No. 11 at 1. On August 13, 2024, Plaintiffs sent a letter to the Clerk stating that no response was received from Defendants. ECF No. 12. Thus, Plaintiffs obligation to attempt service first

under section 1608(a)(3) before moving to service section 1608(a)(4) under was satisfied. *See Doe*, 2020 WL 5422844, at *12 (concluding "[n]othing more was required for [the plaintiffs] to satisfy their obligations to attempt service under section 1608(a)(3)" after the Clerk of the Court mailed the documents and the Syrian Foreign Ministry refused delivery); *Ben-Rafael*, 540 F. Supp. 2d at 52 (similar).

Following the failed attempt at service under section 1608(a)(3), on August 13, 2024, Plaintiffs requested that the Clerk of Court mail two copies of the summons, compliant, and notice of suit to the U.S. Department of State pursuant to section 1608(a)(4). ECF No. 13. Service was executed on Iran under cover of diplomatic note by the Foreign Interests Section of the Embassy of Switzerland in Tehran on November 11, 2024. ECF No. 16 at 6. The diplomatic note was "refused" that same day by the Iranian Ministry of Foreign Affairs. *Id.* Refusal of the diplomatic note constitutes valid service under Section 1608(a)(4). *See Fritz I*, 320 F. Supp. 3d at 88-89 (holding that Iran's refusal of diplomatic note served pursuant to section 1608(a)(4) was sufficient for personal jurisdiction); *Doe*, 2020 WL 5422844, at *13 (concluding that court had personal jurisdiction over Syria after "[s]ervice was executed on Syria . . . through a diplomatic note delivered by the Foreign Interests section of the Embassy of the Czech Republic"); *Ben-Rafael*, 540 F. Supp. 2d at 52–53 (concluding that court had personal jurisdiction over Iran after "the Swiss foreign ministry served the documents on the Iranian Ministry of Foreign Affairs" and they were returned "to the Swiss foreign ministry without comment"). Accordingly, service on Iran was completed under section 1608(a)(4) and the Court therefore has personal jurisdiction over Iran.

### C. Iran's Liability under FSIA

The undersigned now turns to determining whether Plaintiffs have established Iran's liability under a viable cause of action. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 73 (D.D.C. 2010) (plaintiffs must "prove a theory of liability under which defendants cause the

requisite injury or death"). This analysis is complicated by the fact that, while Noi was a U.S. citizen, the Family Member Plaintiffs are not. ECF No. 21-2 at 9; ECF No. 21-5, ¶ 2; ECF No. 21-7, ¶ 2; ECF No. 21-8, ¶ 2; ECF No. 21-9, ¶ 2; ECF No. 21-10, ¶ 2. Since the cause of action in FSIA cases differs based on the plaintiff's citizenship, the undersigned will assess Iran's liability to the estate of Noi Maodi before turning to its liability to the Family Member Plaintiffs.

*1. Estate of Noi Maodi*

Section 1605A(c) provides U.S. citizens a private right of action against foreign states. *See Force,* 464 F. Supp. 3d at 361-62. But it "does not itself provide the 'substantive basis' for claims brought under the FSIA." *Id.* at 361. Rather, U.S. citizens must also "prove a [specific] theory of liability." *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 175-76 (D.D.C. 2010). Because there is no state substantive law to fill that gap in a suit for foreign conduct against a foreign state, the D.C. Circuit "rel[ies] on well-established principles of law, such as those found in Restatement (Second) of Torts." *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009); *see also Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (using the Restatement of Torts "as a proxy for state common law" in determining liability under the FSIA). Here, Plaintiffs assert claims of assault and battery.

*a. Assault*

Plaintiffs first claim that Iran is liable for assault. ECF No. 21-2 at 30–31 n.8. Assault has two elements: "(1) [the defendant] acted 'intending to cause a harmful contact with . . . or an imminent apprehension of such a contact' by, those attacked and (2) those attacked were 'thereby put in such imminent apprehension.'" *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 35 (D.D.C. 2012) (second alteration in original) (quoting *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010)); *see also* Restatement (Second) of Torts § 21(1).

Here, both elements are satisfied. Tomer avers that the Noi and the other occupants of the car were "ambushed by terrorists" who "directed a barrage of gunfire towards" them. ECF No. 21-4, ¶ 9. Deliberately pointing a gun and firing at another person surely evidences the requisite intent. And Noi, the driver of the car, would been placed in apprehension of harmful contact upon seeing the guns aimed at him and the "barrage of gunfire" that followed. *Id.* Accordingly, the undersigned recommends finding that an assault has been sufficiently established at this stage.

*b. Battery*

Plaintiffs next claim that Iran is liable for battery. ECF No. 21-2 at 30–31 n.8. Battery occurs when a person acts "[(1)] 'intending to cause a harmful or offensive contact with. . ., or an imminent apprehension of such a contact' by, those attacked and (2) 'a harmful contact with' those attacked 'directly or indirectly resulted.'" *Wultz*, 864 F. Supp. 2d at 36 (citation modified) (quoting Restatement (Second) of Torts § 13). For similar reasons, the elements of battery are established. As explained above, the deliberate ambush and aiming of guns shows the requisite intent. And as a result of the "barrage of gunfire," Noi received at least one bullet wound to his head. ECF No. 21-4, ¶ 9. Therefore, the undersigned recommends finding that Iran is also liable for battery.

*2. Family Member Plaintiffs*

The Family Member Plaintiffs also seek to hold Iran liable for the pain and suffering they have endured because of Noi's death. ECF No. 21-2 at 1. Because they are not U.S. citizens, they cannot use Section 1605A's federal cause of action to pursue their claims. *See Fritz I*, 320 F. Supp. 3d at 76. Instead, they rely on 28 U.S.C. § 1606, which provides that a foreign state subject to suit under section 1605 "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. This allows them to "bring state law claims that they could have brought if the defendant were a private individual." *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009).

The analysis under 28 U.S.C. § 1606 proceeds in two steps. Because the FSIA incorporates the substantive law of another state or foreign state, the first step is to determine which jurisdiction's law applies. *See Fritz I*, 320 F. Supp. 3d at 89; *see also M.M. v. Islamic Republic of Iran* 708 F. Supp. 3d 22, 47 (D.D.C 2023); *Przewozman*, 754 F. Supp. 3d. at 25. Once the Court determines which jurisdiction's law applies, the second step is to apply that law to the plaintiff's clams. *See Fritz I*, 320 F. Supp. 3d at 91; *see also Przewozman*, 754 F. Supp. 3d. at 27–28.

*a. Choice of Law*

The FSIA incorporates the "the forum [s]tate's choice-of-law rule"—here, that of the District of Columbia. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 109 (2022); *see also Oveissi*, 573 F. 3d at 841. District of Columbia choice-of-law rule requires a "constructive blending" of two tests—the governmental interest test and most-significant relationship test. *Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 556 A.3d 31, 40–41 (D.C. 1989); *see also Oveissi*, 573 F.3d at 842. Fortunately, in this case, both point in the same direction—Israeli law applies.

First, the governmental interest test favors applying Israeli law. The governmental interest analysis examines "the governmental policies underlying the applicable laws and determine[s] which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Oveissi*, 573 F.3d at 842 (citing *Hercules*, 566 A.2d at 41). And Israel, like all sovereigns, maintains a weighty interest in "deterring attacks within its sovereign borders and ensuring compensation for injuries" to its inhabitants. *Oveissi*, 573 F.3d at 842. "Not only does Israel have an interest in protecting its individual citizens, but it also has an interest in punishing those committing crimes on Israeli territory." *Henkin*, 2021 WL 2914036, at *5; *see also Wang v. Islamic Republic of Iran*, No. 22-cv-583, 2025 WL 785736, at *10 (D.D.C March 12, 2025) (weighing location of the injury). Here, the Attacks occurred on Israeli soil, they were directed against Israeli citizens, the Family Member Plaintiffs are all Israeli citizens, and their injuries

occurred in Israel. To be sure, where U.S. citizens are victims, the U.S. has a "unique interest," especially where U.S. citizens are targeted because of their nationality. *Dammarell v. Islamic Republic of Iran*, No. 01-cv-2224, 2005 WL 756090, at *20 (D.D.C. March 29, 2005). But there is no evidence that Noi's attackers were even aware of his U.S. citizenship. Rather, it appears that he was targeted because of his *Israeli* citizenship. *See, e .g.*, ECF No. 1, ¶¶ 12 (noting that the Attacks "target[ed] several cities in the southern part of Israel"), 13 (alleging that Noi was killed "while trying to escape the Attack at the Psyduck music festival near Kibbutz Nirim in southern Israel"); ECF No. 21-3 at 16 (explaining that Hamas is part of a "network align[ed] under an Iranian-guided worldview geared toward the encirclement and eventual destruction of Israel"). Accordingly, the governmental interest analysis weighs in favor of applying Israeli law.

Second, the most-significant relationship test points toward applying Israeli law. The most significant relationship test examines the four Restatement factors: "(1) 'the place where the injury occurred'; (2) 'the place where the conduct causing the injury occurred'; (3) 'the domicil[e], residence, nationality, place of incorporation and place of business of the parties'; and (4) 'the place where the relationship, if any, between the parties is centered.'" *Oveissi*, 573 F. 3d at 842 (quoting Restatement (Second) of Conflict of Laws § 145(2) (1971)). Here, the first factor, the location of the injury, favors applying Israeli law—both the Attacks and the Family Member Plaintiffs' injuries occurred in Israel. *See Abedini v. Government of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 135 (D.D.C. 2019) (looking to place of injury); *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 49 (D.D.C. 2020) (same). For the same reasons, the second and third factors, the location of the conduct and of the parties, point to Israel. Finally, the fourth factor, the place where the parties' relationship is centered, also points to Israel—the place where the Attacks that form the only basis of the relationship between them occurred. *See Henkin*, 2021 WL 2914036, at *6

(finding that relationship was centered in Israel where victims were domiciled in Israel and attack occurred in Israel). Accordingly, the most significant relationship test favors applying Israeli law, too. *See Oveissi*, 573 F. 3d at 842 (concluding that the factors favored applying French law where the victim was a domiciled in France and the attack occurred in France).

Because the governmental interest analysis and most-significant relationship test both point to Israeli law, the undersigned will evaluate the Family Member Plaintiffs' claims under Israeli law. *See Henkin* 2021 WL 2914036 at *6 (evaluating Plaintiffs 28 U.S.C. §1606 claims under Israeli law); *Przewozman* 754 F. Supp. 3d. at 27 (same).

*b. Iran's Liability under Israeli Law*

To establish the content of foreign law, "the court may consider any relevant material or source, including testimony, whether or not submitted by a party[.]" Fed. R. Civ. P. 44.1. The party seeking to apply foreign law bears the burden of establishing that law's substance. *Henkin*, 2021 WL 2914036, at *8 (citing *McKesson Corp. v. Islamic Republic of Iran*, 753 F.3d 239, 243 (D.C. Cir. 2014)). Plaintiffs submit a report by Professor Israel Gilead to explain how Israeli law functions. ECF No. 21-2 at 32. Professor Gilead is an Emeritus Professor of Law at Hebrew University of Jerusalem, where he formerly served as Dean of the Faculty of Law. ECF No. 21-6 at 1. He has written extensively about Israeli tort law. *Id.*at 2. And his opinion on Israeli law has been accepted by other courts in this Circuit. *See Henkin*,2021 WL 2914036, at *8; ECF No. 21-6 at 2.

Professor Gilead explains that Israeli tort law is statutory and primarily governed by the Civil Wrong Ordinance ("CWO"). ECF No. 21-6 at 18. Enacted under the authority of the British Mandate, the CWO is modeled on English common law. *Id.* Given this shared root, Israeli tort law has many similarities with American tort law. *See Henkin*, 2021 WL 2914036, at * 8 (outlining similarities). Under Israeli law, for example, battery and assault closely mirror their American

counterparts. *See id.* While similar, however, American and Israeli law diverge in important ways. Relevant here, the Israeli tort of negligence, for example, is broader than the American version. *See Henkin* 2021 WL 2914036 at *8. Although the fundamental elements of negligence—duty, breach, and but-for and proximate causation—are the same, Israeli courts have recognized a duty where American courts have not—a duty to avoid causing "unreasonable harm knowingly, intentionally, and maliciously." ECF No. 21-6 at 21 (emphasis removed). Thus, Israeli negligence may also cover tortious conduct that American tort law would classify as intentional torts like assault and battery. *Id.* at 18; *Henkin*, 2021 WL 2914036, at *8.

In his declaration, Professor Gilead outlines three distinct theories of liability under which Defendant could be held liable under Israeli law. ECF No. 21-6 at 3. The first two, primary and secondary liability, would impose direct liability on Iran for its actions. *Id.* at 21-24. The third, vicarious liability, would hold Iran liable for the actions of its "agent[s]" (i.e., Hamas). *Id.* at 31-32.

Beginning with primary liability, Professor Gilead explains, and the undersigned agrees, that Defendant can be held directly liable for negligence. Under Israeli law, providing training, know-how, and other forms of support to terrorists is a negligent act. *Id.* at 30. The Israeli Supreme Court first recognized this form of negligence in *Estate of Mantin v. PLO*. *Id.*; *see also* CivA 2144/13 *Mantin Estate v. PLO* (6.12.2017) (Isr.). There, an Israeli citizen was killed by a terrorist who had recently completed a PLO training program. *Id.* Finding the PLO directly liable, the Israeli Supreme Court explained that both the PLO's historic incitement of action against Israel and its provision of arms and training breached a duty of care. *Id.* Notably, even under *Mantin*, the plaintiffs must show that the defendant knowingly, intentionally, and maliciously provided resources to the terrorist organization. *Id.* at 21. But the plaintiff need not prove a link between the

defendant's support and the attack in question. *Id.* at 30. Once a plaintiff has met their burden, it falls to the defendant to establish a lack of causation. *Id.*

As discussed above, Plaintiffs have demonstrated that Iran provided significant support to Hamas. In fact, Iran's support here appears to be greater than the PLO's training program at issue in *Mantin*. *See id.* at 30. Iran did not just provide training to members of Hamas. *See* ECF No. 21-3 at 28–34. They also provided tactical advice, funding, and weapons. *Id.* Plaintiffs have not directly established a causal link between Iran's support and the specific attack on Noi. But that is not the plaintiffs' burden under Israeli law. ECF No. 21-6 at 30-31. The defendant must establish lack of causation. *Id.* at 31. Since the Defendant has defaulted, they have failed to meet their burden under *Mantin*. *See id*. Thus, the undersigned recommends finding that primary liability has been sufficiently established at this stage.

Plaintiffs have also sufficiently established secondary liability under Israeli law. Secondary liability is outlined in Article 12 of the CWO. *Id.* at 23. Article 12 provides that any person who "joins or aids in, authorizes, counsels, commends, procures, or ratif[ies] any act done or to be done . . . shall be liable for such [an act]." *Id.* To prevail on this theory, plaintiffs must establish three elements. First, they must establish liability against Hamas for battery, assault, or negligence. *See id.* at 24. Second, they must show that Iran had "actual knowledge" that their conduct assisted Hamas in committing the tort. *Id*. Actual knowledge simply means that the defendant could have foreseen that their material support could arise to *the type* of terrorist attack. *See id.* at 25-27. Finally, plaintiffs must show that the defendant's support was both material and significant. *Id.* at 25. Material and significant support is support that forms "an integral and significant part in the chain of events that led to [the Attacks]." *Id.* at 28.

Plaintiffs have demonstrated that all three elements of secondary liability are present here. As discussed above, Plaintiffs have shown that the attack on Noi satisfied the American common law definition of an assault and battery committed by Hamas. *See* Section III.C.1, *supra*. And the Israeli version of assault is "analogous to American common-law assault and . . . battery." *Henkin*, 2021 WL 2914036, at *8. So there is an underlying tort here that Iran could have supported. As noted above, Plaintiffs have also demonstrated that the Defendant was aware of the Attacks for years and its support was vital for their ultimate execution. ECF No. 21-3 at 26, 28. Thus, Plaintiffs have also satisfied the foreseeability and causal link requirements for secondary liability under Israeli law. *Henkin*, 2021 WL 2914036, at *9 (imposing secondary liability where the "type of attack was a common Hamas behavior").

Because Plaintiffs have established that the attack on Noi was an assault and battery for which Iran is primarily and secondarily liable under Israeli law, the undersigned recommends finding Iran liable to the Plaintiff Family Members under the private right of action created by 28 U.S.C. § 1608A(c), and not reaching the issue of vicarious liability under Israeli law.[6]

**D. Damages**

The FSIA makes foreign states liable to victims of state sponsored terrorism for money damages including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). "To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain'

[6] Defined by Article 14 of the CWO, vicarious liability under Israeli law operates similarly to *respondeat superior* in American law. ECF No. 21-6 at 32; *Henkin*, 2021 WL 2914036, at *9. Specifically, the CWO specifies that "[a]ny person who employs an agent . . . to do any act or class of acts on his behalf shall be liable for anything done by such agent in the performance of, and for the manner in which such agent does such act or class of acts." ECF No. 21-6 at 32. A tortfeasor is considered an agent of the principal when "acting as a 'surrogate' or 'long arm' of [the principal]." *Id.* While there may be evidence that Hamas operates as a "surrogate" of Iran, applying vicarious liability in the terrorist context appears to be a relatively novel application under Israeli law. Professor Gilead notes that the Israeli Supreme Court's decisions thus far have only dealt with vicarious liability "in the context of commercial/economic activity," rather than the broader forms of Iranian support for Hamas that would be at issue here. *Id.*

(*i.e.*, more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (alteration in original) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105,115–16 (D.D.C. 2005)); *accord Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 289 (D.D.C. 2015). In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injuries. *See Reed*, 845 F. Supp. 2d at 213–14; *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). However, in a default case, the Court may not exceed the amount demanded by the plaintiff. *See* Fed. R. Ci *v.* P. 54(c); *Doe*, 2020 WL 5422844, at *14.

While "there is no market where pain and suffering are bought and sold, nor any standard by which compensation for it can be definitely ascertained, or the amount actually endured can be determined," an award amount must be determined and the Court "will not simply award what it abstractly finds to be fair." *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 22–23 (D.D.C. 2002) (internal quotation marks omitted) (quoting *St. Louis S.W.R. Co. v. Kendall*, 114 Ark. 224, 169 S.W. 822, 824 (Ark. 1914)). Instead, courts are guided by precedent and awards handed down in previous cases decided under the FSIA, *see Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 134 (D.D.C. 2005) ("Fortunately. . . precedence guides [the court's] calculations"), and they should "take pains to ensure" that similarly situated plaintiffs receive similar awards, *Peterson v. Islamic Republic of Iran* (*Peterson II*), 515 F. Supp. 2d 25, 54 (D.D.C. 2007), *abrogated on other grounds as recognized in Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 15 (D.C. Cir. 2015).

Here, Plaintiffs seek four types of damages: pain and suffering, economic damages, solatium damages, and punitive damages. ECF No. 21-2 at 55. They seek a total of $27,711,785 in

compensatory damages and between $138,558,925 and $150,000,000 in punitive damages. *See id.* at 53-55, 54 n.18. Specifically, they seek $1 million on behalf of his estate for the pain and suffering that Noi experienced during the attack and $461,785 for the income lost because of his death. *Id.* at 40, 51. Noi's parents seek $7.5 million each and his three sisters seek $3.75 million each for their emotional distress over Noi's death. *Id.* at 55. Plaintiffs also seek punitive damages for Noi's estate of either $150,000,000 or, in the alternative, equal to five times the total compensatory damages awarded. *Id.* at 54.

1. *Estate of Noi Maodi*

a. *Pain and Suffering*

The Court will not grant pain and suffering in FSIA cases where the victim's death was "likely instantaneous." *Thuneibat*, 167 F. Supp. 3d at 39 n.4. Thus, Plaintiffs must submit evidence showing that "they suffered before succumbing to their injuries." *See Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36, 42 (D.D.C. 2014). If the death is not instantaneous, pain and suffering damages are then determined based on the period of pain and suffering. For periods of less than a minute to a few hours, courts have generally awarded $1 million in damages. *See Selig*, 573 F. Supp. 3d at 64 (collecting cases).

Although it appears that he succumbed to his injuries relatively quickly, the evidence suggests Noi's death was not instantaneous. For example, Tomer avers that Noi was shouting after he was shot. ECF No. 21-4, ¶ 9. Such evidence has been deemed sufficient in other FSIA cases. *See e.g.*, *Braun*, 228 F. Supp. 3d at 83 (awarding pain and suffering damages based on witness testimony that decedent survived); *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 35-36 (D.D.C. 2022) (awarding pain and suffering damages when "the record indicates that [the decedent] was alerted to the attack before his death"); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 113 (D.D.C. 2000) (granting an award of pain and suffering damages when victim survived for 30

seconds). Accordingly, Noi Maodi's estate is entitled to $1,000,000 in survival damages for the pain and suffering he endured prior to his death.

*b. Economic Damages*

Under Section 1605A, foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained because of the foreign state's conduct. 28 U.S.C. § 1605A(c). To obtain an award of damages, plaintiffs must "prove the amount of damages by a reasonable estimate." *Reed*, 845 F. Supp. 2d at 213. In determining the amount of economic damages, a court may rely on documentary evidence or expert testimony, such as the report of forensic economist. *See*, *e.g.*, *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 & n.10 (D.D.C. 2015); *Barry*, 473 F. Supp. 3d at 59; *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 55–56 (D.D.C. 2018). Because "[u]nlike damages for pain and suffering, [economic damages] are not hard to quantify, the Court will not excuse plaintiffs' failure to support the claim . . . with competent evidence." *Moradi*, 77 F. Supp. 3d at 71. Still, in a default judgement case, Plaintiffs need only show that the damages requested are "'reasonably certain' (i.e., more likely than not) to occur." *See Doe*, 2020 WL 5422844, at *14.

Plaintiffs have submitted an expert report by Chad Staller and Stephen Dripps of the Center for Forensic Economic Studies calculating the economic loss resulting from Noi's death. ECF No. 21-11. Staller and Dripps have previously been found qualified by other courts in this Circuit as "experts in the field of economic loss computations." *Coombs v. Islamic Republic of Iran*, No. 19-cv-3363, 2023 WL 12194269, at * 2 (D.D.C. Nov. 6, 2023); *Selig*, 573 F. Supp. 3d at 65. To calculate economic loss, Staller and Dripps reviewed relevant economic data, including the Organization for Economic Co-Operation and Development and the Israel Central Bureau of Statistics, as well as declarations submitted by the Family Member Plaintiffs. ECF No. 21-11 at 1–3.

The undersigned finds Staller and Dripps qualified and their estimates based on reliable principles and methods pursuant to Federal Rule of Evidence 702.

Their report assumes that, if not for the Attacks, Noi would have pursued a master's degree and entered the Israeli labor market by July 1, 2027. *Id.* at 2. There is no evidence in the record that Noi was enrolled in a master's program when he died. Staller and Dripps base this assumption on Noi's father and sister's declarations that he planned to work "in the field of child and youth psychology and get his master's degree." ECF No. 21-10, ¶ 14; *see also* ECF No. 21-5, ¶ 8; ECF No. 21-11 at 1. Other Courts in this Circuit have previously found that family member's testimony about future educational plans are certain enough to ground economic estimates, so long as they are in line with their background. *See, e.g.*, *Thuneibat*, 167 F. Supp. 3d at 49-50 (awarding economic damages based on the assumption that a 9-year-old would have attained a master's degree given her family and educational background); *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 243–44 (D.D.C. 2012) (awarding economic damages based on the assumption that a 14-year-old would have attained a bachelor's degree). Noi's family testified about his love of teaching, his study of psychology in college, and his work as a teacher in Minnesota. ECF No. 21-10, ¶ 14. And they testified that Noi was planning to take classes in November 2023 to prepare for a master's degree. ECF No. 21-5, ¶ 8. Thus, Plaintiffs have sufficiently established that Noi's intention to pursue a master's degree is a reasonable basis for the estimates of economic damages at this stage.

Using data from the Israel Central Bureau of Statistics, Staller and Dripps estimate Noi's lost earning capacity ₪178,392 per year, which is consistent with the average annual earnings for Israeli men with 16 or more years of schooling in 2022 Israeli new shekels. ECF No. 21-11 at 2. The report then converts this value into U.S. dollars using an exchange rate of ₪1 per $0.301. *Id.*

at 5. The report assumes that after attaining his master's degree, Noi would have worked until he was old enough to receive his national pension benefits at 67. *See id.* at 2. Estimates based on the assumption that a person would work until the age one receives their retirement benefits are consistent with other awards in this Circuit of economic damages for both American and Israeli plaintiffs. *See, e.g.*, *Selig*, 573 F. Supp. 3d at 68 (awarding the higher range of economic loss given the likelihood that U.S. plaintiff "would have worked until at least age 67"); *Roth*, 78 F. Supp. 3d at 402 (same); *see also Coombs v. Islamic Republic of Iran*, No. 19-cv-3363, 2023 WL 4894939, at *15 (D.D.C. July 5, 2023) (recommending adoption of "the calculation that applies the social security retirement as for the work life assumption [as] the most reasonable under the circumstances"), *special master's report and recommendation adopted*, 2023 WL 12194269 (D.D.C. Nov. 6, 2023).

Assuming that Noi would have worked until the age of 67, the report estimates his earnings growth based on the average annual rate of change in average annual wages in Israel using Organization for Economic Co-Operation Data. ECF No. 21-11 at 2. After calculating his annual earnings, the report calculates his lost retirement benefits from the national insurance program (2.04% of his annual earnings) and adds it to his earnings from wages. *Id.* at 3. The report then deducts Israeli taxes (about 14.05% annual earnings each year) and personal maintenance cost (estimated to be 54.3% of annual earnings). *Id.* The report further discounts future values to their present values using the average yield of high-grade municipal bonds. *Id.* at 4. The undersigned finds this methodology reasonable and well supported. *See Selig*, 573 F. Supp. 3d at 68 (accepting Staller and Dripps's economic loss calculation when they similarly accounted for relevant factors).

Based on these calculations, Noi's net earnings would have ranged from $4,697 per year to $19,333 per year over his working years. *See* ECF No. 21-11 at 6 (Shekel amounts adjusted to

Dollars). Assuming he worked for 35 years, as explained above, those yearly net earnings amounts total $461,785. *Id.* Accordingly, the total amount of economic damages that should be awarded here is $461,785.

2. *Family Member Plaintiffs*

Noi's parents and three sisters seek solatium awards of $7.5 million each and $3.75 million each, respectively. ECF No. 21-2 at 55. Solatium awards are designed to compensate victims for the "[m]ental anguish, bereavement, and grief" resulting from a loved one's death or injury. *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356–57 (D.C. Cir. 2018) (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998)). But as previously discussed, the Family Member Plaintiffs claims are governed by Israeli law. Thus, they must prove that they are also entitled to damages under Israeli law. *See Henkin*, 2021 WL 2914036, at *9 (applying Israeli theories of recovery after establishing Iran's liability under Israeli law).

Here again, Plaintiffs rely on the declaration of Professor Gilead to establish their eligibility for damages under Israeli law. ECF No. 21-2 at 35–36. Under the so-called "*Alsucha* rule," indirect victims of terrorist attacks can recover for non-pecuniary losses, including emotional distress, so long as they meet four pre-established criteria. ECF No. 21-6 at 5. First, they must be part of the direct victim's "first circle," (i.e., their parent, child, partner, or sibling). *Id.* Second, their emotional harm must have been foreseeable. *Id.* Third, the injury must be proximate in time and place. *Id.* And finally, the indirect victims' emotional harm must be "severe." *Id.* at 6. Emotional harm includes not only the "degree of mental/emotional permanent medical disability determined by medical experts," but also the disruption of daily life and the need for medical treatment resulting from the defendant's actions. *Id.*

Here, all four factors are easily met. The Family Member Plaintiffs are all part of Noi's "first circle." *See* ECF No. 21-5; ¶ 3; ECF No. 21-7; ¶ 3; ECF No. 21-8, ¶ 3; ECF No. 21-9, ¶ 3;

ECF No. 21-10, ¶ 3. And they have all testified to the severe emotional suffering that they have endured because of Noi's death. ECF No. 21-5, ¶¶ 14–21; ECF No. 21-7, ¶¶ 12–19; ECF No. 21-8, ¶¶ 16–26; ECF No. 21-9, ¶¶ 11–21; ECF No. 21-10, ¶¶ 28–36. This suffering has included the need to seek medical treatment. ECF No. 21-5, ¶ 19; ECF No. 21-7, ¶ 18; ECF No. 21-8, ¶ 17; ECF No. 21-9, ¶ 12; ECF No. 21-10, ¶ 35. As to the second and third elements, the Israeli Supreme Court has affirmed that, in terrorism cases, these should be interpreted in "a flexible and 'loose' way." ECF No. 21-6 at 5. Noi's family members' emotional suffering was clearly a foreseeable and direct consequence of his killing. Thus, the undersigned recommends concluding that the Family Member Plaintiffs are entitled to an award of damages under Israeli law.

Having discussed the threshold question of entitlement, the undersigned now turns to quantifying the award of damages. Under typical circumstances, "damages would be calculated pursuant to the law under which liability was found." *Force*, 617 F. Supp. 3d at 36 (quoting *Thuneibat*, 167 F. Supp. 3d at 47). However, the Family Member Plaintiffs' have not presented evidence, nor have they requested, that the Court calculate damages under Israeli law. Where the court lacks a sufficient basis to calculate solatium damages under foreign law, it defaults "to the application of federal law." *Id.* at 37 (quoting *Fraenkel*, 892 F.3d at 358). Thus, the undersigned will calculate damages using the framework developed in *Estate of Heiser v. Islamic Republic of Iran* (*Heiser I*). 466 F. Supp. 2d 229, 269 (D.D.C. 2006). *See also Valore*, 700 F. Supp. 2d at 85 (observing that courts have adopted the *Heiser I* framework as the appropriate measure of damages for family members of terrorism victims). Under that framework, parents of deceased victims are awarded $5 million, while siblings receive $2.5 million. *Heiser I*, 466 F. Supp. 2d at 269. *See also Peterson II*, 515 F. Supp. 2d at 54 ("[T]he Court must take pains to ensure that individuals with similar injuries receive similar awards.").

Nothing requires the undersigned to apply *Heiser*'s damages matrix, *see Fraenkel*, 892 F.3d at 361 ("We decline to impose *Heiser*'s framework as a mandatory scheme under the FSIA."), and even when *Heiser* is used, the "numbers serve only as an anchor from which the Court should deviate to compensate for specific circumstances." *Christie v. Islamic Republic of Iran*, No. 19-cv-1289, 2020 WL 3606273, at *26 (D.D.C. July 2, 2020); *see also Fraenkel*, 892 F.3d at 362 ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, 'different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards.'") (quoting *Fraenkel v. Islamic Republic of Iran*, 258 F. Supp. 3d 77, 82 (D.D.C. 2017)), *rev'd on other grounds*, 892 F.3d 348 (D.C. Cir. 2018). But in the interests of promoting consistency and ensuring that similar harm merits similar damage awards, the undersigned will apply the *Heiser/Peterson II* framework and deviate from it only if appropriate. *See Warmbier*, 356 F. Supp. 3d at 58 (adopting the *Heiser* framework "in the interest of consistency"); *see also Kar v. Islamic Republic of Iran*, Nos. 19-2070, 19-cv-2602, 2022 WL 4598671, at *18 (D.D.C. Sep. 30, 2022) (noting that judges in this Circuit have applied the *Heiser*/*Peterson II* framework "[t]o bring some uniformity" to the damages awards in cases under the FSIA's terrorism exception); *Peterson II*, 515 F. Supp. 2d at 54.

In light of this legal framework and the testimony provided by each of the family members, the undersigned recommends the following solatium awards for the Family Member Plaintiff's for the reasons described below.

*a. Shimon Maodi*

Noi's father, Shimon, requests $7.5 million, a 50% upward adjustment from the $5 million baseline. ECF No. 21-2 at 44. Shimon testified that his son "was everything to [him]" and that Noi was his "right-hand-man." ECF No. 21-5, ¶ 6. Shimon noted that had great expectations for his son and he wanted Noi "to succeed [him] in management of the family flower farm." *Id.*, ¶ 9.

When his son died, Shimon became "overwhelmed with sorrow." *Id.,* ¶ 14. He stopped eating and lost weight. *Id.* Shimon has also been forced to stall work on his farm and thus has "suffered massive losses." *Id.,* ¶ 16. Shimon was diagnosed with PTSD and depression after his son's death and currently takes medication for those conditions. *Id.* ¶ 19.

While the undersigned acknowledges Shimon's grief, "the *Heiser* baseline accounts for this type of suffering and is designed to compensate a parent for it." *Selig*, 573 F. Supp. 3d at 66. As a result, the standard for an upward adjustment is high. *See id.* Such adjustments are warranted only where there is "an unusual circumstance beyond the ordinary anguish that results from losing a family member." *Id.* For instance, in *W.A. v. Islamic Republic of Iran*, the Court granted a 50% upward shift to the deceased victim's family because of the "particularly . . . agonizing" circumstances in that case. No. 18-cv-1883, 2020 WL 7869218, at *16-19 (D.D.C. Mar. 23, 2020) (quoting *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 27 (D.D.C. 2011)). There, the family members were forced to listen to the victim's torture and to flee their home country of Iraq due to fear of reprisal after his death. *Id.* at *3–12. Upward adjustments for medical diagnoses usually only occur when accompanied by one or more hospitalizations. *See Valore*, 700 F. Supp. 2d at 86 (granting a 25% upward adjustment when the surviving family member "suffered several nervous breakdowns, at least one of which required hospitalization.").

Such extraordinary circumstances are not present here. As the Court has previously observed, diagnoses of PTSD and depression are "less severe [conditions] than those found to warrant a significant damages enhancement on their own." *Braun*, 228 F. Supp. 3d at 86. There is also no evidence in the record that Shimon has suffered any other significant medical issues because of his grief aside from weight loss and lack of sleep. *See* ECF No. 21-5. While the business relationship between Shimon and his son is somewhat unique in FSIA cases, this claim is in tension

with the economic damages report. That report based its estimate on the assumption that Noi would pursue a career in line with a master's degree in child psychology. ECF No. 21-11 at 1- 2. It neither estimated nor calculated economic damages based on the assumption that he would work on his family's farm. And the undersigned already credited the forensic economist's assumption, supported by Plaintiffs' own evidence, that Noi would pursue a career in child psychology. *See* Section III.D.1.b *supra*. So, awarding an enhancement based on Noi's inheritance of his father's farm would be contradictory. Thus, the undersigned recommends awarding the baseline amount for parents, which is $5 million.

*b. Tamar Maodi*

Tamar, Noi's mother, also requests a 50% upward adjustment from the $5 million baseline. ECF No. 21-2 at 45. Tamar describes Noi as a "pleasant child" who "loved to help others who struggled with behavioral, social, or educational obstacles." ECF No. 21-7, ¶ 6. She explains that whenever Noi visited Israel he would often "stay with [them] at home." *Id.,* ¶ 10. She also noted that her and Noi "enjoyed cooking and baking together" and that "he would share recipes off the internet." *Id.,* ¶ 11. Since his death, Tamar's life has been "tragically gray." *Id.*, ¶ 14. She now spends most of her time at home and "the thoughts and memories of [her] son accompany [her] . . . in every moment." *Id.,* ¶ 15.

Tamar's suffering is not markedly different than her husband's. *See id.,* ¶¶ 18–19. After her son's death, Tamar was also diagnosed with PTSD and depression. *Id.,* ¶ 18. There is no evidence, however, of any hospitalization or other extraordinary circumstances that would warrant an upward adjustment. Indeed, Tamar noted that despite her grief she tries "to maintain [her] routine of cleaning, tidying, preparing food, working in the garden, taking care of the plants, meeting with friends, and playing sports." *Id.,* ¶ 15. Thus, the undersigned recommends awarding her the baseline amount of $5 million.

*c. Sivan Elkabetz, Shani Rosenberg, Sapir Kitayevich*

The remaining Family Member Plaintiffs, Sivan, Shani, and Sapir, are Noi's three older sisters. ECF No. 21-2 at 45–46, 48. They all seek 50% upward adjustment s from the $2.5 million baseline for siblings. *Id.* at 46, 48–49. In their sworn declarations, all three sisters speak of their close relationship with Noi, their only brother. For instance, Sivan explains that she "trusted [Noi] with everything" and felt she could "share anything with him." ECF No. 21-8, ¶ 8. Shani explains that because they were both teachers, Noi would often videocall her while he was living in Minnesota and consult her on navigating difficulties in his classroom. ECF No. 21-9, ¶ 9. And Sapir describes how he often played with his nieces and nephews and filmed short comedic films with them. ECF No. 21-10, ¶ 16.

After Noi's death, all three sisters were diagnosed with PTSD and depression. ECF No. 21-8, ¶ 17; ECF No. 21-9, ¶ 12; ECF No. 21-10, ¶ 35. They also all describe the void that Noi's death left in their lives. Sivan describes how she is "overwhelmed with feelings of loneliness, emptiness, anxiety and intense longing for [her] brother," often waking in the night and experiencing "constant thoughts about everything that happened during the Attack[s]." *Id.,* ¶¶ 16–17, 25. Shani notes that "there is not a moment that passes where [she does] not think of Noi." ECF No. 21-9, ¶ 15. And Sapir explains that her grief is so great that she "struggle[s] to get out of the bed in the morning." ECF No. 21-10, ¶ 31.

While no doubt immense, the undersigned does not find that the sisters' suffering represents an "*unusual* degree of mental anguish." *Roth*, 78 F. Supp. 3d at 405 (emphasis added). As discussed above, diagnoses of depression and PTSD on their own are insufficient for an upward adjustment in FSIA cases. *Braun*, 228 F. Supp. 3d at 86. And the sisters do not present evidence of any other formal medical diagnoses or evidence of hospitalization in support of their declarations. The sibling relationship the sisters shared with Noi, while no doubt uniquely and personally

treasured by each sister, is not unique in kind or degree from other cases involving the loss of a sibling. *See e.g.*, *Kinuya v. Republic of Sudan*, 466 F. Supp. 3d 1, 11 (D.D.C. 2020) (awarding an upward adjustment when sibling assisted bombing survivor despite loss of the sibling's employment and relationships); *Alinejad v. Islamic Republic of Iran*, No. 19-cv-3599, 2023 WL 4684929, at *22 (D.D.C. July 6, 2023) (awarding a 30% upward adjustment when victim was "the only member of [the Plaintiff's family] who regularly kept in touch with [the Plaintiff] as pressure mounted on her family to distance themselves from" the Plaintiff).

Accordingly, the undersigned recommends awarding Sivan, Shani, and Sapir the $2.5 million baseline amount for siblings in FSIA cases.

*3. Punitive Damages*

Under the FSIA, a foreign sovereign that is a state sponsor of terrorism may also be held liable for punitive damages. 28 U.S.C. § 1605A(c); *see e.g., Rimkus*, 750 F. Supp. 2d at 184–85; *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 61. Punitive damages are awarded not to compensate the victim, but to punish and deter future outrageous conduct by the foreign state. *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 56 (D.D.C. 2012). Four factors are considered in determining a punitive damages award, including "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Acosta*, 574 F. Supp. 2d at 30 (internal quotation marks omitted) (quoting, *Flatow*, 999 F. Supp. at 32).

Here, each of those factors' counsels in favor of awarding punitive damages. Attacks designed to kill unarmed civilians are "unconscionable." *Doe*, 2020 WL 5422844, at *17. The need to deter the support of terrorism is high. *See Braun*, 228 F. Supp. 3d at 86–87 (concluding that punitive damages were warranted against Iran when they supported a known terrorist organization). And finally, the defendant, "as [a] state actor[], can be presumed to possess significant

wealth." *Christie*, 2020 WL 3606273, at *21; *accord Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 25 (D.D.C. 2016).

There are several potential methods to calculate punitive damages in FSIA cases. "The first is to 'multiply the foreign state's annual expenditures on terrorism by a factor between three and five.'" *Selig*, 573 F. Supp. 3d at 75 (quoting *Braun*, 228 F. Supp. 3d at 87). The second method is to award each plaintiff $150 million. *See Levinson v. Islamic Republic of Iran*, No. 17-cv-511, 2020 WL 5834839, at *2 (D.D.C. Oct. 1, 2020). "Third, some courts in this district have calculated the total compensatory damages awarded for a victim and then multiplied that award 'by a factor between one and five.'" *Selig*, 573 F. Supp. 3d at 76 (quoting *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 65 (D.D.C. 2018)).

Plaintiffs do not request that the Court apply the first approach, nor do they provide an estimate of Iran's wealth or its annual expenditures on terrorism. The undersigned therefore declines to recommend the first approach. *See id.* at 76. Plaintiffs instead adhere to the second method and request a flat punitive damages award of $150 million. ECF No. 21-2 at 54. But the $150 million flat-award approach has been criticized for its "inflexibility." *Selig*, 573 F. Supp. 3d at 76 (citing *Christie*, 2020 WL 3606273, at *22 ("[The flat-award method] trades discretion for predictability[.]"), and *Abedini*, 422 F. Supp. 3d at 142 ("[The flat-award method] limits a judge's discretion to tailor a punitive award appropriate to the magnitude of the underlying injury[.]")). More importantly, it is not clear that massive punitive damage awards like the one requested by Plaintiffs are having any real deterrent effect on the Iranian regime. *See Christie*, 2020 WL 3606273, at *21 (noting "'the lack of any evidence that high awards have successfully deterred' Iran" (quoting *Bluth*, 203 F. Supp. 3d at 26)). By now, Iran's total liability stemming from FSIA judgments exceeds $10 billion, and "[a]dding hundreds of millions of dollars to that amount in this

case is not likely to have a meaningful deterrent effect." *Id.* at 29 (noting that, in 2009, one court calculated that "Iran had '10 billion . . . outstanding court judgments' in FSIA cases" (quoting *Iran Terrorism Litig.*, 659 F. Supp. 2d at 37) and that this "amount has surely ballooned over the last decade"). Therefore, the undersigned declines to recommend awarding Plaintiffs $150 million in punitive damages.

In the alternative, Plaintiffs urge the Court to use the third method—using a multiplier of compensatory damages to calculate punitive damages—and award five times the amount of total compensatory damages in punitive damages. ECF No. 21-2 at 54. This multiplier approach is most common in cases that "involve large-scale terrorist attacks (or series of attacks) resulting in numerous deaths." *Goodwin v. Syrian Arab Republic*, No. 23-cv-00267, 2025 WL 1411302, at *12 (D.D.C. May 15, 2025). However, the five-times multiplier approach has been limited to cases where there was a strong showing of its deterrent effect. For instance, in *Valore*, the Court awarded punitive damages of five times the compensatory damages award primarily based on expert testimony that Iran had "begun to more actively participate in litigation in the United States and elsewhere." 700 F. Supp. 2d at 89. No such showing has been made here.

Instead, the undersigned finds the more widely used multiplier of three times compensatory damages appropriate. Outside of those more exceptional circumstances, application of the three-times multiplier is the "usual practice" of Courts in this Circuit. *See Karcher v. Islamic Republic of Iran*, No. 16-cv-232, 2025 WL 561261, at *4 (D.D.C. Feb. 20, 2025) (quoting *Roth v. Islamic Republic of Iran*, No. 14-cv-1946, 2018 WL 4680270, at *17 (D.D.C. Sep. 28, 2018)); *see also. Stearns v. Islamic Republic of Iran*, No. 17-cv-131, 2023 WL 4999215, at *1, *4 (D.D.C. Aug. 4, 2023) (using a multiplier of three in a case involving "a series of attacks using explosively formed penetrators" that killed multiple people); *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31,

50–51 (D.D.C. 2012) (using a multiplier of three in a case involving the bombing of the U.S.S. Cole resulting in multiple deaths), *judgment vacated on other grounds in light of Republic of Sudan v. Harrison*, 587 U.S. 1 (2019).

While it is true that the Attacks were particularly deadly and worthy of condemnation, there is no compelling evidence to show how a larger punitive damage award would deter Iran from supporting terrorism in the future. Thus, the undersigned would not recommend departing from the standard practice of Courts in this Circuit in these types of cases of awarding three times compensatory damages.

4. *Post Judgement Interest*

Finally, Plaintiffs seek post-judgment interest. An award of post-judgment interest is determined by federal law pursuant to 28 U.S.C. § 1961(a). Section 1961 states that post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield." 28 U.S.C. § 1961(a). "[A]n award of post-judgment interest under this statute is mandatory, not discretionary." *Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-0252, 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021); *see also Selig*, 573 F. Supp. 3d at 78; *Boothe v. Islamic Republic of Iran*, No. 22-cv-1747, 2026 WL 809887 at *18 (D.D.C. Mar. 24, 2026). The Court should therefore award Plaintiffs post-judgment interest at the rate as established in 28 U.S.C. § 1961(a).

## IV. CONCLUSION

Given Defendant's failure to respond to the Complaint and the adequacy of the Plaintiffs' Motion for Default Judgement, the undersigned recommends that the motion, ECF No. 21, be granted and that the Plaintiffs be awarded damages in the amounts specified in the table below.

| **Estate of Noi Maodi** | |
|---|---|
| Pain and Suffering Award | $1,000,000 |
| Compensatory Damages | $461,785 |
| Total Damages Award | $1,461,785 |

| **Family Member Plaintiffs** | |
|---|---|
| Solatium Award to Shimon Maodi | $5,000,000 |
| Solatium Award to Tamar Maodi | $5,000,000 |
| Solatium Award to Sivan Elkabetz | $2,500,000 |
| Solatium Award to Shani Rosenberg | $2,500,000 |
| Solatium Award to Sapir Kitayevich | $2,500,000 |

| **Total Damages** | |
|---|---|
| Total Compensatory Damages | $20,461,785 |
| Total Punitive Damages | $61,385,355 |
| Total Damages Award | $81,847,140 |

* * * * *

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to a Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of the Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date: November 4, 2026

G. Michael Harvey

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE